LEMMON, Judge.
Plaintiff was injured when her car collided with a dump truck which entered the *834 highway on which she was traveling. She sued the insurer of the truck and the insurer of the company who employed flagmen stationed at the entrance to the highway where the accident occurred. After a trial on the merits the trial court found all parties negligent and dismissed the suit. Plaintiff has appealed.
At the time of the accident a five mile segment of Morrison Road (then designated as Alternate Highway No. 11) in the eastern section of Orleans Parish was being utilized to connect completed portions of Interstate Highway No. 10. The connecting link of I — 10 was under construction nearby, and numerous sand-carrying dump trucks used or crossed Alternate Highway 11 at various points. Along Alternate Highway 11, characterized by the police officer as “open country”, the posted speed limit was 45 miles per hour.
The accident occurred at the point where Crowder Road intersected with the highway. Both were two-lane, two-way roads, with traffic on Crowder Road controlled by a stop sign. Dumping operations were being carried on adjacent to Crowder Road, about 300 feet north of the intersection.
Plaintiff, traveling west on the highway, approached the point where Crowder Road intersected and observed a flagman just off the edge of the roadway, about 25 feet from the intersection, waving an orange flag in an up and down sweeping motion. Interpreting his waving motion as a signal to go ahead, she continued at her normal speed (within the limit posted along the five mile area of construction) and proceeded past the flagman. Just then, a dump truck on Crowder Road, which had stopped at the stop sign, moved forward from her right and into her path. She left 20 feet of skid marks attempting to avoid the collision. Her right front struck the truck’s left front fender.
In addition to the previously mentioned flagman directing westbound traffic from the north edge of the highway, there was a second flagman on the south edge of Alternate Highway 11, who had brought the eastbound traffic to a stop. The truck driver testified that when a third flagman signaled him across, he proceeded without looking to his left, having earlier seen plaintiff at some distance down the highway. Both flagmen and their foreman denied the existence of a third flagman, and the trial judge found as a fact that none existed. We conclude that the truck driver stopped at the sign, but then entered the highway at a time when it was unsafe to do so in violation of R.S. 32:123, subd. B.[1] His negligent conduct in this regard caused the accident.
However, we do not find any liability on the part of the flagman or his employer. The trial judge found these parties negligent primarily because of the confusing flag system, which presented difficulty in communicating an intelligible signal to an approaching driver. Certainly, as plaintiff suggests, a hand sign with the word “STOP” would have been more effective and clear. However, the flagman did not blindly wave plaintiff into the side of the truck, but simply attempted to stop eastbound traffic in order to thereafter allow the stopped truck to safely enter the highway. While the truck driver was in the stopped position, the flagman had no duty to stop oncoming traffic. It was the truck driver who owed a duty to oncoming traffic to remain stopped until the traffic passed or was halted by the flagman. Therefore, *835 any confusing motion misinterpreted by plaintiff would still not have caused the accident, as long as the truck remained stopped. It was therefore the truck driver’s violation of his duty not to enter the highway until it was safe to do so, rather than any confusing flag signal, which caused this accident.
We likewise find no liability on plaintiff’s part. Although defendants argue that if plaintiff was confused by the flag signal, she should have stopped or slowed, plaintiff did not state that she was confused. She testified that she received a signal to continue and did so. This conduct does not constitute negligence if she was reasonable in so interpreting the signal. In this regard the trial judge observed demonstrations of the signaling motion and twice stated that it was confusing. We interpret this to mean that it could be interpreted in more than one way, and from the description of the motion in the record, we conclude that plaintiff was reasonable in interpreting the motion as a signal that no trucks were then entering from the side road and that she could continue traveling along the main highway at a speed wtihin the specially posted limit.
Furthermore, even if the flagman had communicated an unmistakable signal to stop, plaintiff owed no duty to the stopped truck driver to do so. Again, it was the truck driver who owed the duty to plaintiff to remain stopped until highway traffic from both directions had been completely halted or had cleared the intersection.
Defendants cite R.S. 32:237, which imposes prima facie responsibility on a person violating warning signs placed upon a highway under construction or repair. We find the statute inapplicable to this situation. Alternate Highway 11 was not a highway under construction, but was more properly a highway where trucks entered from various side roads carrying materials for construction of another highway.
Accordingly, we conclude that plaintiff is entitled to a judgment against the insurer of the dump truck.
QUANTUM
Plaintiff was taken to a hospital emergency room after the October 1, 1970 accident. A general surgeon examined her and diagnosed hematoma, contusion and abrasion of the forehead; tenderness over the laryngeal box; neck spasm; contusion, abrasion and swelling of the chin; bruises on both knees; and a laceration of the lower leg, which he treated by debriding and inserting a gauze pack under anesthesia to provide for drainage. After a consultation concerning the larynx, the doctor released plaintiff to return home and remain at bed rest.
In a few days plaintiff exhibited spasm in the neck and lower back and developed significant discoloration of the face. She continued under treatment until the middle of November, when the doctor reported no objective findings and a full range of motion. However, plaintiff’s persistent complaints of pain in the back and neck at November and January visits prompted the doctor to recommend an orthopedic consultation.
The orthopedic specialist examined her on January 19, 1971. He reported complaints of pain in the neck and shoulder areas, but found no spasm or serious pathology and only mild symptoms. In view of these findings, he considered treatment unnecessary and instructed plaintiff to return if the symptoms worsened or persisted for a long time.
When plaintiff returned in July after a two week onset of pain in the thoracic and lumbar areas, the doctor obtained further x-rays and discovered a compression fracture of the thoracic spine and a generalized osteoporotic condition. He hospitalized her for two days to determine the cause of the osteoporosis.
*836 He attributed her complaints to a combination of a curved spine, postural symptoms, her porotic condition and anxiety. He stated that the compression fracture, even if caused by trauma, should not cause pain over an extended period of time, but should become totally asymptomatic when healed.
The leg laceration healed in due course, but left a one inch scar below the knee with a surrounding area of pigmentation one half inch in diameter.
At the time of trial, IS months after the accident, plaintiff testified that she still experienced pain, particularly in the thoracic area, at frequent intervals and continued to take the muscle relaxant originally prescribed by the treating physician and continued by the orthopedist.
Plaintiff proved the following medical expenses:
Hospital emergency room and x-rays $231.00
Treating physician 87.00
Consulting physician (for larynx) 29.00
Orthopedic specialist 82.00
Medicine 57.50
Total $486.50
Although we allow the charge of the orthopedic specialist, we disallow the expense of the second hospitalization, since osteoporosis was unrelated to the accident.
Plaintiff is also entitled to recover the $100.00 she paid for the deductible portion of her property damage and $13.70 for towing charges.
Plaintiff returned to her work as a secretary after six weeks and worked half days for the next two weeks, having difficulty because of the long periods of sitting required. She testified that she used 44i/á days of cumulative sick leave, or a total of approximately two months at 22 days per month. We find that she had proved a loss of wages in the amount of $941.05.
We further find that plaintiff is entitled to recover the sum of $2,500.00 in general damages. Her initially severe pain and suffering from most of the numerous injuries resolved in less than two months. She complained thereafter of persistent pain in the neck, shoulders and back. Although non-traumatic factors were contributing causes of the persistent complaints, she had never suffered pain in these areas prior to the accident. Furthermore, the trial judge commented on the injuries in a manner so as to express his belief in the sincerity of her complaints. Additionally, the leg scar constitutes minor but permanent disfigurement.
For these reasons, the judgment of the trial court is reversed in part, and it is now ordered that judgment be rendered in favor of Dorothy E. Kruebbe and against National Fire and Marine Insurance Company in the sum of $4,041.25, together with legal interest thereon from the date of judicial demand until paid, and all costs of court, including the medical expert fee set by the trial judge in the sum of $100.00. That portion of the judgment dismissing plaintiff’s suit against Aetna Casualty and Surety Company is affirmed.
Reversed in part, affirmed in part.

. R.S. 32:123, subd. B provides: “Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop * * * at the point nearest the intersecting roadway wheré the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.” (Emphasis supplied)